# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GREEN BAY PACKAGING, INC., )
)
    Appellant, )
)    No. 07 C 2233
    v. )
)    Wayne R. Andersen
JEFFREY F. OSCARSON, )    District Judge
)
    Appellee. )

## MEMORANDUM OPINION AND ORDER

This case is before the court on appeal from the United States Bankruptcy Court for the

Northern District of Illinois. The issues on appeal are whether the bankruptcy court incorrectly

denied discharge of certain debts of appellee Jeffrey Oscarson pursuant to 11 U.S.C. §

523(a)(2)(B) and § 727(a)(4). For the following reasons, we affirm in part and reverse in part.

## BACKGROUND

We adopt the following facts from the findings made by the bankruptcy court. Oscar F.

Oscarson ("Fred") formed Midwest Packaging ("Midwest") in 1968. Fred was a paper broker

and, through Midwest, he brokered deals for corrugated boxing materials with Midwest's

customers and placed the orders with suppliers. The suppliers then shipped the boxes directly to

Midwest's customers.

Fred's son, Jeffrey Oscarson ("Jeff") joined Midwest in 1995 as a salesman. Midwest

was organized as a limited liability company and, in or around 2000, Jeff bought 10 percent of

Midwest from Fred. On August 20, 2003, Jeff bought the remaining 90% membership right in

Midwest and Fred later retired from the business.

Appellant Green Bay Packaging, Inc. ("Green Bay") was Midwest's primary supplier

during Midwest's last several years of business. Green Bay's typical terms for payment were a

one percent discount for payment in 10 days, and net payment due in 30 days. Green Bay allowed Midwest to pay invoices on more lenient terms because it believed that Midwest's customers took 90 days to make payments. By 1999 and 2000, however, Midwest's payment times started to approach 70 days.

*A. Fred and Jeff's 2000 Financial Statements*

Green Bay operated on a credit system and extended a line of credit to Midwest. Prior to 2000, Green Bay had never conducted a credit analysis of Midwest and had never required Fred or Jeff to provide financial statements or guarantees of Midwest's obligation to Green Bay. In 2000, Midwest's documented credit limit with Green Bay was $350,000. Green Bay never gave written authorization for Midwest's outstanding balance to exceed $350,000. Nevertheless, by April, 2000, Midwest's outstanding balance to Green Bay exceeded $518,000.

Because of Midwest's increasing obligation, as well as slowing payment times, in 2000 Green Bay for the first time required Fred and Jeff to provide a guarantee of Midwest's obligation as well as personal financial statements (the "2000 financial statements"). Fred and Jeff submitted their respective statements on April 12, 2000. Because of Green Bay's longstanding relationship with Fred, Green Bay did not test the veracity of those statements and did not request trade references or supporting documents. Midwest's documented credit limit remained virtually the same following receipt of the financial statements.

*B. Jeff's 2003 Financial Statement*

By 2003, Midwest's payment time to Green Bay continued to slow, taking anywhere from 75 to 90 days. As a result, Green Bay requested an updated financial statement from Jeff, who had assumed control of Midwest's business operations. Jeff provided this statement to

Green Bay on July 1, 2003 (the "2003 financial statement"). At that time, Midwest's obligation to Green Bay was $213,098.06.

Jeff's 2003 financial statement contained a number of inaccuracies with regards to Jeff's then-existing financial condition. During the bankruptcy court proceedings, Green Bay contended that it relied on the truthfulness of the 2000 and 2003 financial statements and that, had it known of the inaccuracies contained in the 2003 financial statement, it would not have continued to extend credit to Midwest.

## C. Midwest Goes Out of Business

By June, 2005, Midwest's balance to Green Bay had grown to over $644,000 and Green Bay cut off Midwest's credit. Midwest closed its doors soon after, and both Fred and Jeff thereafter filed for relief under Chapter 7.

## D. Jeff's Schedules and Statement of Financial Affairs

Jeff filed his bankruptcy schedules and Statement of Financial Affairs on October 13, 2005. He subsequently filed four amendments to the schedules. In his initial schedules, Jeff listed only a checking account at Fifth Third Bank; he failed to disclose a cash and money market account that he and his wife, Laura Oscarson ("Laura"), held jointly at Edward Jones, as well as a mutual fund account held outside of Edward Jones. None of Jeff's amendments corrected this response. As of the date of Jeff's bankruptcy filing, the Edward Jones cash and money market account held approximately $16.31 and the mutual fund account contained approximately $2,600.

On or about June 4, 2005, approximately four months prior to Jeff's filing for bankruptcy, Laura wrote a check from the mutual fund account in the amount of $23,000 to cash with a notation for "vacation" on the memo line (the "vacation check"). Laura deposited that

3

check into a savings account held solely by her at Washington Mutual on or about June 6, 2005. This transaction was not disclosed in Jeff's Statement of Financial Affairs. Laura wrote several other checks from her Washington Mutual account after the $23,000 check cleared. There was evidence presented to the bankruptcy court that Jeff also wrote several checks from Laura's Washington Mutual account, though those checks were signed by Laura.

On June 2, 2005, Midwest wrote a check to Jeff in the amount of $23,000, which Jeff then deposited into the Fifth Third account that he held jointly with Laura. On June 3, 2005, Laura wrote a check to cash from the Fifth Third account in the amount of $20,000 with a notation for "tax refund" on the memo line (the "tax refund check"). Laura deposited that check in her Washington Mutual account on that same day. Jeff did not disclose this check in his Statement of Financial Affairs, and Jeff's Chapter 7 trustee Charles Myler has filed an adversary proceeding against Laura seeking to recover that amount on the theory that it was a fraudulent transfer.

Also on or about June 3, 2005, Jeff or Laura transferred $2,500 and $9,000 in two separate transactions from their Fifth Third savings account to their Fifth Third checking account (collectively, the "college checks"). That same day, Laura wrote checks in the same amounts from the Fifth Third checking account to cash. Laura then deposited those checks that day in her Washington Mutual account.

On October 13, 2005, Laura deposited $15,000 into her Washington Mutual account. During the bankruptcy court proceedings, Jeff testified that he did not know the source of the funds for this deposit.

During the bankruptcy court proceedings, Green Bay introduced into evidence multiple statements from Edward Jones, which reflected a joint account for Jeff and Laura, the balance of

which was $3,338.05 in March, 2005. By June, 2005, this account was closed. Jeff did not disclose this account on his Statement of Financial Affairs, which requested that Jeff disclose all financial accounts that were closed, sold, or otherwise transferred within one year preceding the commencement of Jeff's bankruptcy filings.

Jeff scheduled his household goods and furnishings with a value of $1,000. During the bankruptcy proceedings, however, Green Bay introduced into evidence a copy of Jeff's personal articles insurance policy for the period of September 25, 2004 to September 25, 2005, which indicated that he insured jewelry, computer equipment, and classical instruments for over $26,000. Jeff testified during those proceedings that he valued his property for the bankruptcy schedules based on what he would expect to receive at a garage sale. He also testified that he did not own the jewelry or classical instruments.

Finally, Jeff did not schedule any liability to Fred that might still be due and owing under the agreement by which Fred transferred his membership rights in Midwest to Jeff. Jeff stated that he did not disclose those amounts because Fred was his father.

*E. The Bankruptcy Court Proceedings*

On February 1, 2006, Green Bay filed a complaint against Jeff in the United States Bankruptcy Court for the Northern District of Illinois in which it sought to deny discharge of Jeff's debt pursuant to 11 U.S.C. § 523(a)(2)(B) and 11 U.S.C. § 727(a)(4). Following a trial on the merits, the bankruptcy court ruled in favor of Jeff because it found that Green Bay failed to meet its burden of proof as to both statutes. Green Bay now appeals the bankruptcy court's decision.

## DISCUSSION

The United States District Courts have jurisdiction over appeals from final judgments in bankruptcy cases pursuant to 28 U.S.C. § 158(a). We review factual findings of the bankruptcy court for clear error, giving great deference to the bankruptcy court. Fed. R. Bankr. P. 8013; *In re Yonikus*, 974 F.2d 901, 903 (7th Cir. 1992). Thus, "we may reverse factual findings only if, upon the entire record, we reach the definite and firm conviction that a mistake has been committed." *Id.* We review the bankruptcy court's conclusions of law *de novo*. Fed. R. Bankr. P. 8013; *Yonikus*, 974 F.2d at 903-04.

*A. 11 U.S.C. § 523(a)(2)(B)*

Green Bay contends that the bankruptcy court committed reversible error when it denied Green Bay's claim that Jeff's debt was non-dischargeable under 11 U.S.C. § 523(a)(2)(B). Section 523(a)(2)(B) exempts from discharge any debt:

> (2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by –
>
> (B) use of a statement in writing –
>
> > (I) that is materially false;
> >
> > (ii) respecting the debtor's or an insider's financial condition;
> >
> > (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and
> >
> > (iv) that the debtor caused to be made or published with intent to deceive.

The discharge provisions of Section 523 are construed strictly against the creditor and liberally in favor of the debtor. *In re Scarlatta*, 979 F.2d 521, 524 (7th Cir. 1992). To have succeeded under its 523(a)(2)(B) claim, Green Bay was required to prove, by a preponderance of the evidence, (1) that Jeff made statements in writing; (2) that the statements were materially false; (3) that the statements concerned Jeff's financial condition; (4) that Jeff intended to deceive

Green Bay when he made the statements; and (5) that Green Bay actually and reasonably relied upon the misrepresentations. *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995).

Green Bay contends that the bankruptcy court committed reversible errors when it found that Green Bay did not actually rely on Jeff's 2000 or 2003 financial statements, that Green Bay did not exercise due diligence in investigating those statements, and that Jeff did not have an intent to deceive Green Bay when he filled out his 2003 financial statement. Having had the benefit of listening to all testimony and examining all exhibits in this case, the bankruptcy court found that Green Bay requested Fred and Jeff's financial statements merely to document Green Bay's credit file and that Midwest's credit balance was determined by Green Bay's long positive business history with Fred as well as Midwest's customer payment patterns, as opposed to the financial statements. The bankruptcy court further found that Midwest's substantial balance—in excess of $518,000—prior to Green Bay's request for the financial statements was compelling evidence that Green Bay did not rely at all on either Fred or Jeff's financial statements to extend credit to Midwest.

Based on our review of the record, we cannot find that the bankruptcy court's factual finding that Green Bay did not rely on Jeff's financial statements in extending credit to Midwest was clearly erroneous. Because we affirm the bankruptcy court's finding with respect to reliance, we need not reach the issues of Jeff's intent when filling out his financial statements or whether Green Bay exercised due diligence in investigating Jeff's statements. Accordingly, we affirm the bankruptcy court's ruling that Green Bay failed to meet its burden of proving each of the elements under Section 523(a)(2)(B) as to Jeff.

*B. 11 U.S.C. § 727(a)(4)(A)*

Green Bay next contends that the bankruptcy court committed reversible error when it

refused to deny Jeff's discharge under 11 U.S.C. § 727(a)(4)(A) based upon Jeff's alleged false

oaths in his bankruptcy petition and schedules. Section 727(a)(4)(A) exempts from discharge

any debt:

> (4) [unless] the debtor knowingly and fraudulently, in or in connection with the case –
>> (A) made a false oath or account . . . .

Section 727 is construed against the objecting creditor and liberally in favor of the debtor in

order to protect the debtor's fresh start. *In re Sapru*, 127 B.R. 306, 314 (Bankr. E.D.N.Y. 1991).

To have succeeded on its 727 claim, Green Bay was required to prove by a preponderance of the

evidence (1) that Jeff made a statement under oath; (2) that the statement was false; (3) that Jeff

knew the statement was false; (4) that Jeff made the statement with the intent to deceive; and (5)

that the statement related materially to the bankruptcy case. *In re Self*, 325 B.R. 224, 245

(Bankr. N.D. Ill. 2005).

Green Bay contends that the bankruptcy court committed reversible error by (a) failing to

place the burden back onto Jeff to disprove his fraudulent intent once Green Bay established

certain "badges of fraud," and by (b) disregarding the objective evidence which allegedly proved

Jeff's fraudulent intent. It is well established that because direct evidence of fraudulent intent is

rarely available, the requisite intent under Section 727(a)(4)(A) may be inferred from

circumstantial evidence or by inferences based on an entire course of conduct. *In re Yonikus*,

974 F.3d at 905. The Seventh Circuit has articulated several factors which, if shown, indicate

actual fraud: (1) the lack or inadequacy of consideration; (2) the family, friendship or close

associate relationship between the parties; (3) the retention of possession, benefit, or use of the

property at issue; (4) the financial condition of the debtor; (5) the existence or cumulative effect

of the pattern or series of transactions or course of conduct after the incurring of the debt, onset

of financial difficulties, or pendency or threat of suits by creditors; and (6) the chronology of

events and transactions under inquiry. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th

Cir. 2002). If the creditor can show that one or some of these factors are met, then there is a

presumption of an intent to defraud which establishes the creditor's prima facie case and shifts

the burden to the debtor to prove that she lacked fraudulent intent. *Id.*

Here, it is not apparent from the record that the bankruptcy court shifted the burden to

Jeff to prove that he lacked fraudulent intent when he filled out his bankruptcy petition and

schedules. During the bankruptcy proceedings, Green Bay introduced evidence that, when Jeff

filled out his bankruptcy petition and schedules, he (1) failed to disclose three transfers of funds

that were made to Laura (the vacation check, the tax refund check, and the college checks); (2)

failed to disclose the Edward Jones account which contained approximately $2,600 on the date

of Jeff's bankruptcy filing; (3) scheduled his personal property with a value of $1,000 even

though he insured such personal property for over $26,000 during the time period just before

filing; (4) failed to disclose his alleged interest in Laura's Washington Mutual accounts; and (5)

failed to schedule any liability to Fred that might still be due and owing under the agreement by

which Fred transferred his membership rights in Midwest to Jeff. In determining Jeff's intent,

the bankruptcy court should have looked at Jeff's entire course of conduct leading up to his

filing for bankruptcy and then considered the factors articulated by the Seventh Circuit in *Village

of San Jose*. We find that one or some of those factors are present here and, thus, the bankruptcy

court should have shifted the burden to Jeff to demonstrate that he lacked fraudulent intent.

However, the bankruptcy court did not appear to analyze the evidence with respect to the fact

that Jeff had the burden of proving that he lacked fraudulent intent. Accordingly, we reverse the

bankruptcy court's ruling that Green Bay failed to meet its burden under 11 U.S.C. § 727(a)(4)(A). We remand this case to the bankruptcy court so that it can determine whether Jeff met his burden of proving that he lacked fraudulent intent when he filled out his bankruptcy petitions and schedules.

## **CONCLUSION**

For the foregoing reasons, the judgment of the bankruptcy court discharging Jeffrey Oscarson's debt to Green Bay Packaging, Inc. is affirmed in part and reversed in part. We affirm the bankruptcy court's ruling that Green Bay failed to meet its burden under 11 U.S.C. § 523(a)(2)(B). We reverse the bankruptcy court's decision that Green Bay failed to meet its burden under 11 U.S.C. § 727(a)(4)(A). We remand this case to the bankruptcy court so that it can determine whether Jeff met his burden of proving that he lacked fraudulent intent when he filled out his bankruptcy petitions and schedules.

It is so ordered.

Wayne R. Andersen
District Judge

Dated: November 7, 2007